IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| H&H Industries, Inc., | : | |
| Plaintiff, | : | Case No. 2:13-cv-907 |
| v. | : | Judge Graham |
| Erik S. Miller, | : | Magistrate Judge Kemp |
| Defendant. | : | |

Opinion and Order

This matter is before the court on the motion of plaintiff H&H Industries, Inc. for a preliminary injunction against its former employee Erik S. Miller based on alleged misappropriation of trade secrets and violations of his confidentiality agreement with H&H. The court conducted an evidentiary hearing on October 29 and 30, 2013. The court held a continued hearing on December 19, 2013 in which the parties presented additional evidence that largely related to a forensic examination of Miller's laptop computer issued by Polar Rubber Products, Miller's new employer and a direct competitor to H&H.

Miller maintained from the outset of this action that he did not take H&H's proprietary information or disclose such information to his new employer. He represented that he had abided by all of his obligations under the confidentiality agreement. Because the evidence has now demonstrated that Miller has been untruthful, concealed evidence, and did in fact misappropriate H&H's confidential information and disclose it to Polar, the court grants H&H's motion for a preliminary injunction.

I.      Findings of Fact

H&H Industries is located in Oak Hill, Ohio and is in the business of retreading and repairing off-the-road ("OTR") tires and selling used OTR tires. On the retreading side of the business, H&H uses molds and blends of rubber to retread tires to a depth and tread pattern best suited for the application in which they will be used. On the repair side, H&H makes various types repairs – including bead, section, belt, and reinforcement – so that tires may be returned to service.

1

H&H sells tires to service providers located in the Eastern United States. There are about 120 service providers with which H&H does or could do business. These service providers in turn sell the tires to end users, such as companies in the mining industry.

Noah Hickman has been the President and Chief Executive Office of H&H since 2006. H&H has approximately 80 employees, including 5 salesmen. H&H relies greatly on its sales team to establish relationships with service providers and gather information that will assist H&H in meeting the needs of customers and making sales.

H&H maintains three categories of computer files or databases relating to its customers. First, it has a customer database with contact information for each service provider. This database includes, for instance, the name, cell phone number, and email address of the appropriate person at a given service provider to contact about OTR tires. Though this information may be gleaned to some extent from available sources (such as company websites and industry trade publications), H&H has spent years developing relationships with customers and gathering information that may not be readily available (such as cell phone numbers and after-hours phone numbers – as opposed to general office numbers – and the names of salesmen that deal in OTR tires).

Second, H&H maintains pricing files. A master pricing database shows the pricing that each of H&H's customers get for the various types of tires they buy. It also contains information regarding rebates that may be offered to customers and the pricing terms available to each customer, such as credit limits. Hickman sets the prices, and the prices are communicated to H&H salesmen. H&H maintains other related pricing files on its computer server, including a list of used tire prices and a formula for calculating prices for solid tires.

Third, H&H maintains a tire tracking system. This system is used to maintain data regarding tires that are in H&H's inventory and production, as well as tires that H&H has sold. The system has data fields for customers, tire specifications, dates that tires were put into service, repair history, prices, costs, and margins, among many other fields.

H&H seeks to maintain the confidentiality of its customer, pricing, and tire tracking information. Access to the information is restricted to Hickman and his salesmen. The files are password protected, meaning that a salesman must use a password on his computer to gain access to H&H server, where the files are kept. Further, at least in the case of the pricing files, they are maintained in a computer folder that is named "Private." The salesmen, including Miller, sign confidentiality agreements in which they agree to keep confidential various types of information provided by H&H to the employee, unless H&H has consented to disclosure. Miller has

acknowledged that the customer, pricing, and tire tracking databases were the type of files that H&H expected to be kept confidential under the confidentiality agreement. See, e.g., Dec. 16, 2013 Miller Dep. at 281-310.

Miller began working for H&H in 2006. He performed data entry, including working on developing H&H's tire tracking system. He also worked in an inventory position and as a second shift production supervisor. He then moved to a sales position, where Hickman personally trained him and taught him how to be a salesman of OTR tires. As a salesman, Miller had access to H&H's confidential information. He signed a confidentiality agreement in 2007.

On Friday, July 26, 2013, Miller informed Hickman of his intention to accept a sales position with one of H&H's competitors, Polar Rubber Products, a Canadian company. Miller had not entered into a non-competition agreement with H&H. On July 27, Miller went into his H&H office to remove personal items and informed Hickman of his resignation. On the same day, Miller accepted a job with Polar.

H&H filed this action on September 16, 2013. In its verified complaint, H&H alleged that Miller had misappropriated its trade secrets and breached the confidentiality agreement by disclosing confidential H&H information to Polar. H&H alleged that the disclosure of information would allow, and had already allowed, Polar to unfairly compete with H&H and take away its customers. H&H filed a motion for a temporary restraining order and preliminary injunction.

After holding an initial telephone conference with the parties, the court on September 19, 2013 issued a TRO enjoining Miller from using, distributing, or misappropriating H&H's proprietary information, including customer, pricing, and tire tracking databases. Miller was also ordered to deliver to the magistrate judge certain electronic devices in his possession. The information on those devices was imaged for preservation and the devices returned to Miller. Miller was also ordered to allow access to certain email accounts. However, the court declined to issue the branch of the TRO sought by plaintiff that would have enjoined Miller from working for Polar. The court so declined to enjoin Miller based on his representations that he had not taken or misappropriated any H&H proprietary information.

The court conducted an evidentiary hearing on October 29 and 30 and December 19, 2013. The court heard the testimony of Miller, Hickman, and an expert in computer forensic science, Matthew Curtin of Interhack. The court admitted into evidence numerous documents submitted by H&H. Though the court heard a great deal of evidence, the court mentions below only the evidence most pertinent to its decision to grant preliminary injunctive relief. Notably, additional forensic

3

evidence presented at the December 19 hearing revealed that Miller had in fact misappropriated confidential H&H pricing information, shared it with Polar, and took steps to conceal his conduct from H&H and the court.

Miller spent a week at Polar's offices in Canada when he was first hired in late July 2013. During this week, Miller arranged to have four H&H pricing files containing confidential price lists and a pricing formula electronically transferred to his Polar email account. Miller accessed these files from his newly-issued Polar laptop computer. Miller testified that he had kept these files on his personal Gmail account and/or the hard drive of his personal home computer while he worked for H&H so that he could provide pricing information to customers who contacted him during the evening.

One of these four files was H&H's master pricing guide called "Copy of Pricing All." Ex. 70. This file, some 35 pages long, contained detailed information regarding the prices that each of H&H's customers received for various types of tires. Miller accessed this file from his Polar laptop on July 30, 2013 and again on August 6, 2013 at 10:01 a.m. Ex. 67, Fig. 2. On August 6, 2013 at 10:06 a.m., Miller sent an email from his Polar account to Polar Office Manager Tyler Pollard that said, "Since we are going up against H&H on this deal[,] here is their [foam-filled] cap price." Ex. 23. The email then listed the prices for 3 types of tires. According to Hickman, the prices disclosed by Miller in the email corresponded precisely with the price one would reach by consulting the appropriate page of the Copy of Pricing All file and then increasing the prices by 30%, which Hickman said all H&H salesmen knew to do. The Copy of Pricing All file appears to have been deleted by Miller from his Gmail account on September 18, 2013. Ex. 67 at ¶ 6(c).

Another of the pricing files was a price list for used tires named "Used Tire Pricing March 2013." Ex. 75. Some 30 pages long, this file contained detailed pricing for various used tires sold by H&H. Hickman testified that used tire sales comprise about 40% of H&H's sales. Miller opened this file while at Polar's office and stated out loud to the Sales Manager Jason Greenham that he had acquired H&H's used tire price list. Greenham asked Miller to provide him with the list, and Miller emailed the file to both Greenham and Pollard. At some point after emailing the file to his supervisor, Miller deleted the file from his laptop.

The two other H&H pricing files to which Miller had access from his Polar laptop were a pricing formula and a price list for solid-filled tire recapping. Exs. 73, 74. A computer forensics analysis demonstrated that both files were at some point in the working memory system of his Polar

laptop. Ex. 67 at ¶¶ 7(c), 8(b). At some point before September 18, 2013, Miller deleted these files as well.

Computer forensic analysis also established that the laptop computer issued to Miller by H&H had a file manager program named "altapsalamander" installed on it in August 2012 without Hickman's or H&H's authorization. This program, Curtin testified, could be used to delete files with overwrite capacity. According to Curtin, the program could be used in order to make deleted files unreadable.

Curtin also testified that his examination had found that a flash drive had been inserted into Miller's H&H tablet computer on September 10, 2012. This same flash drive was inserted into Miller's personal computer on July 30, 2013. Forensic examination of the flash drive cannot be conducted because Miller has not yet produced the device to Interhack. Miller claims that he has delivered all flash drives in his possession to Interhack; however, none produced so far have matched the one identified by Interhack as having been inserted into the H&H computer and then Miller's personal computer after he terminated his employment with H&H. In Curtin's supplemental declaration of December 8, 2013, he states that additional forensic examination established that the missing flash drive was inserted into Miller's Polar laptop on July 30, 2013, a few hours before a "Jump List" was created by Microsoft Windows on that laptop indicating that the Copy Pricing All file had been accessed. Ex. 67 at ¶ 6(b).

The evidence also included an email dated August 21, 2013 from Miller to Polar's president showing that Miller was targeting sales to customers that, at least in part, were old H&H clients of his and had not before purchased tires from Polar. Ex. 20. H&H also submitted evidence of instances in August 2013 where Miller used knowledge of the preferences of his old H&H clients and communicated that information to his supervisors and Polar's president. 37 ("This is a guy I have dealt with quite a bit and … [he] likes [a certain tire size and tread]."); Ex. 39 ("[W]e did [certain tires] at the other place [H&H] for them quite a bit.").

Miller has maintained that he has not taken or misappropriated H&H confidential information. In an August 12, 2013 email sent by Miller to counsel for H&H, who had sent a letter to Miller stating H&H's concerns about Miller's conduct, Miller stated, "I can assure you, without a doubt that I did not or will not engage in acts to divulge any trade secrets." Ex. 61. In a September 17, 2013 telephone conference with the court, counsel for Miller stated that Miller was unaware of any H&H data that he took and would agree to a preservation order. Counsel for Miller expressed his willingness to comply with the TRO and delivery of electronic devices because Miller had not

5

taken any H&H proprietary information. In a September 27, 2013 deposition, Miller was asked he if he had ever kept an electronic copy of a particular chart that is the first page of the Copy of Pricing All file, and he responded, "No, not that I'm aware of." Sept. 27, 2013 Miller Dep. at 12. Miller also denied at the deposition of having any knowledge of how any pricing formulas were constructed by Hickman. Id. at 16. At the October 29 and 30, 2013 hearing, Miller represented that he did not have a plan to convert H&H customers to Polar customers, Oct. 29, 2013 Tr. at 86, and responded "absolutely not" to the question of whether he had taken any H&H information, Oct. 30, 2013 Tr. at 307.

It was not until December 2013, when Interhack uncovered convincing evidence that Miller did acquire and access confidential H&H pricing files while at Polar (and later attempted to delete evidence of having had the files), that Miller began to acknowledge his misconduct. For instance, Miller gave testimony in a December 16, 2013 deposition that contradicted his October 30 testimony when he stated that he knew he had H&H's confidential information on his Polar laptop. Dec. 16, 2013 Dep. at 117 (A: "I knew that it was H&H's information, yes." Q: "Confidential information, correct?" A: "Yes."). And Miller conceded to having disclosed at least some of the pricing information to Polar. Id. at 320.

## II.   Conclusions of Law

Preliminary injunctions are available under Rule 65(a) of the Federal Rules of Civil Procedure. They are extraordinary remedies that are governed by the following considerations that a court must take into account when examining a motion for a preliminary injunction: (1) whether the movant has a strong likelihood of success on the merits, (2) whether the movant would suffer irreparable injury absent an injunction, (3) whether granting the injunction would cause substantial harm to others, and (4) whether the public interest would be served by granting the injunction. Ohio Republican Party v. Brunner, 543 F.3d 357, 361 (6th Cir. 2008); see also Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 20 (2008). "The party seeking the preliminary injunction bears the burden of justifying such relief, including showing irreparable harm and likelihood of success." McNeilly v. Land, 684 F.3d 611, 615 (6th Cir. 2012).

### A.  Likelihood of Success

Though no one factor is controlling, likelihood of success on the merits is often the most important factor in evaluating a motion for preliminary injunctive relief. See Jones v. Caruso, 569 F.3d 258, 277 (6th Cir. 2009). Of H&H's claims against Miller, two underpin its motion for

preliminary injunctive relief – breach of the confidentiality agreement and misappropriation of trade secrets.

The court readily concludes that H&H has demonstrated a likelihood of success on the merits of its claim for breach of the confidentiality agreement. It is undisputed that Miller entered into such an agreement and that the definition of "confidential information" – "all data, materials, . . . computer programs, specifications . . . and other information disclosed to" the employee by H&H – included H&H pricing files. Ex. 5. The agreement prohibited Miller from communicating confidential information to anyone outside H&H except upon prior authorization by H&H. The evidence conclusively established that Miller breached this agreement by providing the entire "Used Tire Pricing March 2013" file to Polar managers and by communicating to these same managers on August 6, 2013 the tire prices that H&H offered to a certain customer. Ex. 23. The court finds that Miller's explanation of the August 6, 2013 disclosure – that he had called the customer to find out the prices that H&H offered them – is not credible, particularly in light of the evidence that Miller accessed H&H's Copy of Pricing All file (from which the prices could be determined) only five minutes before sending the email to Polar's managers.

Turning to the trade secrets claim, the Ohio Uniform Trade Secrets Act defines misappropriation as the:

> 1) [a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means;
>
> 2) [d]isclosure or use of a trade secret of another without the express or implied consent of the other person by a person who ... [u]sed improper means to acquire knowledge of the trade secret, [a]t the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret that the person acquired was derived from or through a person who had utilized improper means to acquire it, was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or was derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use, [or b]efore a material change of their position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

O.R.C. § 1333.61(B).

A trade secret is defined as information that derives independent economic value, actual or potential, from not being generally known to or ascertainable by proper means by other persons who can obtain economic value from its disclosure or use and is the subject of efforts reasonable under the circumstances to maintain its secrecy. O.R.C. § 1333.61(D). Courts use several factors in

determining whether information is a trade secret: the extent to which the information is known outside the business; the extent to which the information is known to employees inside the business; the precautions taken by the holder of the trade secret to guard the secrecy of the information; the savings effected and the value to the holder in having the information as against competitors; the amount of effort or money expended in obtaining and developing the information; and the amount of time and expense it would take for others to acquire and duplicate the information.  See State ex rel. Plain Dealer v. Ohio Dep't of Ins., 80 Ohio St.3d 513, 524–25, 687 N.E.2d 661, 672 (Ohio 1997); Thermodyn Corp. v. 3M Co., 593 F.Supp.2d 972, 986 (N.D. Ohio 2008).

In determining whether information is a trade secret, a court should distinguish between "knowledge and skill that is general in the trade as a whole and 'secret' knowledge which is acquired particularly and specifically from the employer." Valco Cincinnati, Inc. v. N&D Machining Service, Inc., 24 Ohio St.3d 41, 46, 492 N.E.2d 814, 818 (Ohio 1986).  Information discoverable by "fair and honest means, such as by independent invention, accidental disclosure, or by so called reverse engineering, that is by starting with the known product and working backward to divine the process which aided in its development or manufacture," is not a trade secret.  Kewanee Oil Co. v. Bicron Corp., 416 U.S. 470, 476 (1974).

The court finds that H&H has demonstrated a likelihood of success on the merits of its trade secrets claim.  Though H&H maintains three categories of proprietary information (customer, pricing, and tire tracking), it is the pricing information for which the evidence is strongest that Miller has committed a misappropriation.  Pricing information not generally known outside of a company has been found to be the company's trade secrets.  Penetone Corp. v. Palchem, Inc., 627 F.Supp. 997, 1006 (N.D. Ohio 1985).  The evidence showed that the only instances in which H&H shared its pricing is when a customer wanted a price quote on a tire.  H&H did not share that price quote with other customers or any competitors.  Even within H&H, access to pricing files was limited to salesmen, who had to enter a computer password to access the pricing files in a "Private" folder on H&H's server and who had to sign confidentiality agreements.  See Valco, 24 Ohio St.3d at 47, 492 N.E.2d at 819 (noting that efforts to restrict access to information and requiring employees to execute confidentiality agreements have been found to be reasonable steps to protect trade secrets); The Rightthing, LLC v. Brown, No. 3:09-cv-135, 2009 WL 249694 at *8 (N.D. Ohio Feb. 2, 2009) (holding that the protection of computerized records through password-based access restrictions is reasonable protection).

Moreover, Hickman testified that the pricing data and formula represented many years' worth of time and experience to develop and was finely-tuned for a multitude of variations in tire characteristics (outside diameter, rim diameter, width, rubber blend, tread depth, tread pattern, cap type, etc.) as well as customer characteristics (cash on delivery, credit limit, purchase order, availability of rebate, etc.). The evidence established that price is a major selling point over which H&H and its competitors compete in selling OTR tires to service providers. The H&H pricing information in the four files that Miller had access to from his Polar laptop thus was of great value to H&H and, in the hands of Polar, would help it compete against H&H.

Miller argues that the pricing files are not trade secrets because pricing information is traded around by customers. Customers who receive a quote from H&H can, and do, turn around and share the quote with a competitor in an attempt to get the price lowered. Though the evidence did not establish how prevalent this practice is (Miller and Hickman had different opinions on this), it does happen. However, the court finds that Miller did not demonstrate that prices are by any means generally known or readily available. "The secrecy requirement in trade secret law is not a demand of absolute secrecy." Dayton Superior Corp. v. Yan No. 3:12-cv-380, 2012 WL 1694838, at *13 (S.D. Ohio Apr. 18, 2013) (internal quotation marks omitted). Courts are generally concerned with whether the trade secret owner has taken reasonable measures to protect the confidential information, which H&H has. Id. The types of disclosures committed by customers are at best small snippets of information pertaining to a couple of tires (out of hundreds of possible variations of tires offered by H&H) and pertaining to prices that the customer may be in fact exaggerating about. These disclosures are certainly not comparable to sharing entire pricing databases or pricing formulas.

The court also finds, as recited above, that Miller has committed a misappropriation. Forensic examination and Miller's own testimony at the December 19, 2013 hearing established that Miller did in fact acquire four computer files containing secret H&H pricing information and formulas on his Polar laptop while he was a Polar employee. And on two clear occasions he disclosed H&H's pricing information to Polar: he sent the H&H used tire pricing guide to Polar's managers and he communicated H&H's prices to those managers on August 6, 2013 when they were preparing a price quote for a customer. See O.R.C. § 1333.61(B) (defining misappropriation as including both improper acquisition and improper disclosure of a trade secret).

Miller's attempts to defend his conduct are unconvincing. Miller tries to explain that it was his wife who emailed the four H&H files to his Polar email account because she was trying to clean

9

out old files from their home computer.  Even so, his wife did not testify at the hearing, and the evidence is clear that Miller was well aware that these were proprietary H&H files that he had in his possession – files that he admitted in his testimony that H&H and he considered confidential. Miller did not immediately delete all four files from his Polar account but instead kept the files in his possession.  Indeed, he shared the used tire price file with Polar managers and accessed the master pricing guide a week later just a few minutes before telling Polar what H&H's prices were for a particular customer for three kinds of tires.  And according to the computer forensics examination, the other two price files were at some point in the working memory system of his Polar laptop.

The court thus finds that H&H has demonstrated a likelihood of success on the merits of its breach of confidentiality agreement and trade secrets claims.

### B.  Irreparable Injury

The movant must show that "irreparable injury is *likely* in the absence of an injunction." Winter, 555 U.S. at 22 (emphasis in original).  A mere possibility of injury is not enough.  Id.  H&H argues that injury has already occurred and that additional injury is likely absent an injunction that not only prohibits Miller from using or disclosing H&H confidential information but also enjoins Miller from working for Polar.  The court agrees and finds that H&H is likely to suffer irreparable injury absent granting in full the preliminary injunctive relief sought by H&H.

H&H has already suffered harm in that, at a minimum, Miller disclosed to Polar the prices that H&H offered a certain customer.  Ex. 23.  Miller argues that there was no real harm done because Polar did not ultimately get the sale.  This may be true, but knowledge of this information made Polar more competitive with H&H because Polar reduced its prices in response to what Miller said H&H was offering.  One cannot expect that knowledge of H&H's prices will allow Polar to get every sale – quality, turn-around time, and availability are other factors in the purchasing decision. But knowledge of H&H's prices has and will give Polar an unfair competitive advantage.  Based on all of the circumstances presented to the court, the court is convinced that the example seen in Exhibit 23 is not an isolated incident.  Given the disregard shown by Miller (by blurting out loud in Polar's offices that he had an H&H price file on his computer) and the interest in the file expressed by Greenham and the ready compliance shown by Miller in giving the file to Polar managers, given Miller's failure to immediately delete all H&H files to which he had access from his Polar laptop, given that Miller quickly targeted and claimed to have successfully sold tires to at least a couple of his old H&H clients who were new to Polar (Ex. 20), given that Miller freely provided to Polar's president the tire preferences of some of his old H&H clients (Exs. 37, 39), the court finds that it is

10

highly probable that Miller has used H&H pricing information in a manner similar to the way he used it in Exhibit 23 in many other, if not every other, instance in which he has bid up against H&H for a sale.

Miller's testimony that such information would be of no interest to Polar is not credible. Miller tried to explain that Polar cannot set its own prices. Polar, Miller claimed, is not a retread company; a business named KAL Tire is who performs the type of retreading and repair work that H&H performs and then sells the tires to Polar. It is KAL Tire who sets the prices, Miller asserted, and it would not be useful for Polar to know H&H prices. The court rejects this reasoning for several reasons. First, Miller confessed on cross-examination that Polar is a division of KAL Tire. Second, the evidence is clear that Polar has in fact lowered prices in response to knowing H&H's prices. Ex. 23. Third, Polar directly competes with H&H. Even if Polar is not fully able to adjust prices or match H&H's prices in every instance, having knowledge of H&H's price will give Polar an unfair competitive advantage.[1]

The troubling circumstances of this case lead the court to conclude that a substantial likelihood exists that Miller possesses additional copies of proprietary H&H files, even if he has deleted them from his Gmail account and Polar laptop. Forensics examination has established that a flash drive exists that was inserted into an H&H tablet computer, Miller's personal computer, and Miller's Polar laptop. Miller has thus far failed to produce the flash drive for examination. The court finds that it is substantially likely that this device contains H&H confidential information. This device was inserted into Miller's Polar laptop in close proximity to the time at which a Microsoft Windows "Jump List" was created on that laptop indicating that the H&H Copy Pricing All file had been accessed. Ex. 67 at ¶ 6(b). Other evidence supports the conclusion that Miller has engaged in untruthful and deceptive behavior. Curtin's testimony established that Miller had on his H&H computer a program which served the purpose of making deleted files unreadable. Forensic examination found that the "WebCache" file on Miller's Polar laptop (which would have provided some evidence of his computer usage) was cleaned out on September 18, 2013, the same day the court conducted a telephone conference and announced its intention to issue a TRO the following day ordering Miller to surrender his electronic devices for inspection. Ex. 67 at ¶ 6(c). Further,

---

[1] It should be noted that one possible defense that the court did not hear much evidence on was whether pricing information becomes stale. Because the evidence did not suggest that OTR tire prices are volatile and because, in any event, one of the files taken by Miller was a formula that could be adjusted for different variables (ex. 73), the court finds that the pricing information taken by Miller in July 2013 remains sensitive as of the date of this order.

Miller testified that he contacted a potential witness in this case (the customer at issue in Exhibit 23) on December 17, 2013 to discuss their recollection of events and to ask the customer to send an email stating that he supplied the H&H prices to Miller. In addition, as noted above, Miller has been untruthful in his representations to the court and his testimony about not having taken, possessed, used, or disclosed any H&H confidential information once he started working for Polar.

Curtin testified that there is a likelihood that the four H&H pricing files could exist on Polar's computer server. In the case of the used tire pricing guide, it is clear that this file was emailed to two Polar managers and entirely possible that they have retained possession of this file. In any event, Curtin testified that the mere action of the managers in opening the email would likely have caused the file to be saved to Polar's server. The court's concerns about harm to H&H is compounded by Polar being located in a foreign country and having thus far resisted H&H's efforts to obtain discovery about the information Miller gave to it. The entire scenario before the court presents a significant risk that Miller and Polar have and will continue to use H&H's confidential information (particularly pricing information) to unfairly compete with and harm H&H.

As to the branch of the preliminary injunction request to enjoin Miller from working for Polar, the court finds that the special circumstances of this case warrant such a serious measure. Miller has been untruthful with H&H and the court and will likely, if given the opportunity, continue to be untruthful. He has supplied Polar with confidential information that Polar has used to directly compete with H&H. There is a substantial likelihood that H&H's pricing information still resides within the possession of Miller and Polar – Miller has not delivered the missing flash drive and Polar has not cooperated with H&H's attempts to obtain discovery. Further, as noted above, there is evidence that Miller has deleted files and acted with intent to destroy evidence. Miller, who should have from the outset of this litigation disclosed the fact of his acquisition of the four pricing files, concealed his conduct and made the evidence of his wrongdoing discoverable only through significant expenditures of time and money by H&H in conducting forensic examinations of nine separate electronic devices. Even at the October 29 and 30, 2013 hearing, Miller denied all wrongdoing, and H&H was then forced to prove its case by conducting additional costly and time-consuming forensic analysis of fragments of data recovered from Miller's Polar laptop. In sum, Miller successfully concealed and lied about his conduct from the outset of this case and thwarted H&H from being able to present facts establishing that it was entitled to preliminary injunctive relief at the October hearing or sooner.

The court finds that the pricing information misappropriated by Miller remains current and that its possession by Miller and Polar poses a significant risk of irreparable injury to H&H's business. It is imperative for the court to take corrective action now. In light of Miller's deceptive behavior, the court finds that the only effective measure available to protect H&H's interests is to enjoin Miller from working for Polar. No other measure gives the court confidence that Miller will not continue to harm his previous employer.

### C. Other Factors

The court must also consider whether granting injunctive relief will cause substantial harm to others and whether the public interest would be served by granting the injunction. Ohio Republican Party, 543 F.3d at 361. The court is aware that Miller has a family to support and that the injunction will impose a hardship on them. The court believes that Miller's own deceptive conduct is the reason why the branch of the injunction enjoining him from working for Polar is necessary. Had Miller been candid about his conduct from the start of this case and had Miller and his new employer been able and willing to disprove the existence on any H&H files in their possession, the court likely would not have approved such a measure. Indeed the court declined to do so as part of the TRO.

Finally, H&H has established that Ohio has a public policy interest in favor of an employer's ability to protect trade secrets. See Al Minor & Assoc., Inc. v. Martin, 117 Ohio St.3d 58, 63-64, 881 N.E.2d 850, 854-55 (Ohio 2008). This policy is reflected in Ohio's adoption of the Uniform Trade Secrets Act. O.R.C. §§ 1333.61-.69. The public has a legitimate interest in H&H, an Ohio company, being able to protect its trade secrets.

### III. Preliminary Injunction Order

Accordingly, H&H's motion for a preliminary injunction (doc. 3) is GRANTED. Miller's motion to dissolve the TRO (doc. 34) is DENIED. The court withholds a decision on H&H's request for permanent injunctive relief.

Miller and his agents, servants, employees, and those persons in active concert or participation with him who receive actual notice of this preliminary injunction order are until further court order hereby enjoined from:

  A. Acquiring, using, misappropriating, or disclosing proprietary, confidential, and trade secret information of H&H, including:

1. H&H's proprietary pricing and sales information, programs, formulas, volume pricing, and customer rebates;
2. H&H's proprietary customer database containing details of current and potential customers, including both professional and personal customer information;
3. H&H's proprietary tire tracking system; and
4. H&H's proprietary manufacturing information, including information regarding production equipment, raw materials, suppliers, and production costs.

B. Soliciting H&H's customers and diverting sales from H&H customers;
C. Working for Polar Rubber Products, KAL Tire, any corporate affiliate of Polar or KAL, or any other direct competitor of H&H.

Miller is under a continuing obligation to provide discovery to H&H and to produce for examination any electronic devices, including the missing flash drive identified in Curtin's declarations (Ex. 41 at ¶¶ 5, 8; Ex. 67 at ¶ 6(b)), that he has not previously produced and that may contain discoverable information.

The total bond required of H&H to post with the Clerk of Court is increased from $10,000 to $50,000.

IT IS SO ORDERED.

                                                                s/ James L. Graham
                                                                 JAMES L. GRAHAM
                                                                 United States District Judge

Date: December 27, 2013